No. 45,831

SECRETARY OF THE ARMY, ON BEHALF OF ALL EXECUTIVE AGENCIES OF THE UNITED STATES OF AMERICA, *Appellant*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Appellee*, and THE KANSAS POWER AND LIGHT COMPANY, *Appellee*, and THE CITY OF McPHERSON, A MUNICIPAL CORPORATION, *et al.*, *Appellees*.

(476 P. 2d 629)

Opinion filed November 7, 1970.

*Peter Q. Nyce, Jr.*, of Washington, D. C., argued the cause, and *Robert J. Roth* and *Elmer Hogue*, both of Topeka, and *Carlton E. Crotty*, of Washington, D. C., were with him on the brief for the appellant.

*Richard C. Byrd*, of Ottawa, argued the cause and was on the brief for the appellee, The Kansas Power and Light Company.

*Jack Glaves, Sard F. Fleeker* and *E. Edward Johnson*, all of Topeka, were on the brief for the appellee, The State Corporation Commission of the State of Kansas.

*Paul R. Wunsch,* of Kingman, and *Howard Harper,* of Junction City, were on the brief for the appellees, The City of McPherson, a Municipal Corporation, *et al.*

The opinion of the court was delivered by

HATCHER, C.: This is an appeal from the judgment of the district court of Geary County affirming an order of the State Corporation Commission granting in part and denying in part an application of the Kansas Power and Light Company for an increase in rates and charges for natural gas service in the state of Kansas.

The district court found the order of the State Corporation Commission to be lawful and reasonable, and rendered judgment sustaining the order. The Secretary of the Army, on behalf of all executive agencies of the United States of America, has appealed to this court.

We will for the purpose of brevity hereinafter refer to the Secretary of the Army as appellant, the State Corporation Commission as the Commission and the Kansas Power and Light Company as KP&L. Briefs have been filed for the appellant, the Commission as appellee and KP&L and the city of McPherson, *et al.,* as intervenors and appellees.

Although we will consider the facts as we discuss the specific issues presented, it may be stated generally that on August 7, 1967, KP&L filed its application with the State Corporation Commission for approval of changes in its charges for natural gas service in the state of Kansas. The changes requested by KP&L in its application would have increased its gross revenue from gas sales by $1,822,828.00, amounting to a net increase after taxes of $925,267.00.

Hearings were held on October 16 and 17, and December 4 and 5, 1967. Upon completion of the hearings, the Commission requested and received briefs and suggested findings of fact and conclusions of law from the parties of record. On January 4, 1968, the Commission issued an order approving in part and denying in part KP&L's application. The Commission order approved an annual increase in revenue of approximately $1,733,980.00. The Commission's order dated January 4, 1968, was served on KP&L on that date.

The appellant's gas rates were increased from 33 cents per MCF to 35.5 cents per MCF.

The appellant first contends that the Commission's order is in-

valid on its face because it permitted the increased rates to become effective January 4, 1968, the date of the order, rather than thirty days thereafter.

There are two statutes regulating the effective date of a change in rates—K. S. A. 1969 Supp. 66-113 states:

"All orders and decisions of the corporation commission whereby any rates, . . . are altered, changed, modified, fixed or established, . . . shall be served on the public utility . . . and such order and decision shall become operative and effective *within thirty* (30) *days* after such service; . . ." (Emphasis supplied.)

K. S. A. 66-117 states:

"No change shall be made in any rate, toll, charge or classification or schedule of charges, . . . of any such public utility . . . without the consent of the commission, and *within thirty days* after such changes have been authorized by said corporation commission, . . ." (Emphasis supplied.)

The order was dated January 4, 1968, and was to become effective on that date. It was also served on KP&L as of January 4, 1968.

We think the words "within" as used in the two statutes limits the time within which the order must become effective rather than extend the effective date to thirty days beyond the date of the order.

Appellant's contention that the order could not become effective before March 8, 1968, thirty days after the order denying the petition for rehearing, presumes that the application for rehearing filed by the appellant stays or delays the effective date of the Commission's order. The rules of practice and procedure adopted by the Commission and filed with the Revisor of Statutes and which, by law, have the effect of statute, clearly provides that the filing of an application for rehearing does not stay the effect of the Commission's order. The Commission's rule 82-1-235, subsection (*f*), states:

"The filing of an application for rehearing or the granting of a rehearing shall not excuse any corporation or person from complying with and obeying any order or decision of the commission theretofore made, or operate in any way to stay or postpone the enforcement thereof, except in such cases and upon such terms as the commission may by order direct."

The appellant argues that the necessity for increased rates is not supported by substantial evidence and therefore the Commission erred in approving the increase.

In the consideration of this question it should be understood that in the exercise of its authority and jurisdiction the Commission is clothed with a wide discretion and its findings, when supported by substantial competent evidence, are not to be vacated or set

aside by a reviewing court merely on the ground that such court, had it been sitting as a fact-finding body, would have arrived at a conclusion different than that of the Commission. (*Rock Island Motor Transit Co. v. State Corporation Comm.*, 169 Kan. 487, 219 P. 2d 405.)

Neither should a court in considering the record substitute its judgment for that of the Commission if the matter is within the realm of fair debate. (*Southwestern Bell Tel. Co. v. State Corporation Commission*, 192 Kan. 39, 386 P. 2d 515.)

KP&L's application and exhibits attached thereto show that the gas department, prior to the adjustments made by the Commission's staff, was earning only 4.10% rate of return under the existing rates. The Commission's order stated:

". . . After considering applicant's capital structure, the geographical areas in which it operates, the reasonableness of its expenses, the quality of the service and the other relevant considerations, we deem a range of reasonable return in this case to be from 6.65% to 7% on the rate base we have adopted. Fluctuations from year to year are inevitable and, in our opinion, a return of 6.65% on said rate base will not be unreasonably low, nor would a return of 7% thereon be unreasonably high."

There was uncontroverted evidence that the then existing rates of KP&L's gas department were earning the company only a 4.10%, or at the most 4.20% rate of return.

The uncontroverted testimony also showed that KP&L's cost of gas had increased 2 cents per MCF since the 1963 rates were determined by the Commission.

A KP&L witness testified as to the increased cost in the company's expenses, not only in the cost of purchased gas, but in labor, materials, taxes and interest.

After an extended investigation the Commission determined that the company was entitled to additional revenue in the amount of $1,733,980.00, permitting the company to earn a rate of return of 6.87%. This the Commission found was within a range of reasonableness.

Without setting out the testimony in detail we are forced to conclude that there was ample evidence to support the Commission's findings and order.

The appellant next contends that the proposed rates are unreasonable and discriminatory in that Fort Riley is not accorded treatment equal to that of other customers who receive natural

gas under like or similar conditions of service. It appears that the appellant would contend the Commission should have found the government owned, operated and maintained distribution systems at Fort Riley and Schilling Manor housing to be similar to municipalities operating public utilities, and that they should have the advantage of the wholesale for resale rate available to such municipalities.

A brief study of the testimony reveals that neither the operation at Schilling Manor nor Fort Riley, with reference to gas billings, is handled like either an ordinary municipal or public utility operation. The occupants of the homes receiving gas from the Army merely forfeit their housing allowance when occupying government quarters, and the housing allowance includes payment for utilities in no set amount. The "payment" is a mere paper transaction—there is no per MCF statement or accounting, and in fact there is no resale either as a municipality or as a public utility.

Before appellant would be entitled to the municipal wholesale for resale rate, it would have to be a municipality which it is not. In addition, before it would be entitled to either of the rates which it contends the Commission should make available to it, it would have to show that the gas they purchase is for resale. The evidence in the record clearly shows that the government is not reselling gas to the extent that it would justify the Commission in finding that they are entitled to a wholesale for resale rate. As a government witness testified, their so-called "resales" are merely interdepartmental transfer of fund transactions.

There are no meters at Schilling Manor housing and only a few for non-army personnel at Fort Riley. The Army takes gas for Fort Riley and Schilling Manor housing from seven different points on the pipeline.

The Commission found:

". . . The Department of Defense, a large firm user which under its existing tariff purchases gas at an average price considerably lower than other firm users, contended that it should be classified as a wholesale for resale customer. The Commission's staff presented a detailed cost of service study which was helpful to the Commission in testing the reasonableness of the tariffs we find should be made effective. The following statements are found pertinent to tariff making herein:

(a) The Department of Defense is not a public utility and its customer classification should not be changed to wholesale for resale. The rate now in effect to said customer was determined to be reasonable and appropriate pursuant to a separate hearing relating to the 1963 rate case, and the increase

proposed by Applicant to said customer is in no way discriminatory in light of the increased commodity costs and other evidence in the instant case."

Appellant contends that KP&L's general service customers bear too great a portion of revenue requirements.

The only argument presented to support this contention follows:

"The rates are unjust and unreasonable in that the general service customers bear too great a portion of the revenue requirement. They take 28 percent of KPL's gas volume, but contribute 48 percent of total gas revenue. Approximately 60 percent of the proposed revenue increase will be borne by general service customers. On the other hand, Kansas Gas Supply and Anadarko are receiving unduly preferential treatment. These two contract sales currently represent 18 percent of KPL sales but contribute only 10 percent of its revenue, and they do not share any portion of the proposed increase. . . ."

A disparity in price between firm and industrial customers standing alone is hardly grounds for complaint. In *Gas & Fuel Co. v. Public Utilities Commission*, 116 Kan. 165, 225 Pac. 1036, we stated in paragraph 2 of the syllabus:

"In determining what is a reasonable rate for gas supplied by a utility, consideration should be given to the cost of the producing or obtaining of gas for distribution, and it is held that under the evidence there were good reasons for allowing a higher price for gas supplied for domestic use with the varying demand of consumers than for that supplied and sold to industrial plants where there is steadiness of demand."

In the opinion of the court stated at page 171:

". . . A great deal of testimony was produced as to the prices at which gas could be purchased in the vicinity of the plant and as to the difference between the price of gas supplied for domestic use and the price at which it was sold to industrial plants. That furnished for industrial purposes, it was shown, is for a fixed quantity day after day throughout the year, while that supplied for domestic use fluctuates in quantity and varies according to weather conditions and the needs of customers. Much more is used by domestic consumers in the morning from seven to ten o'clock and but little is used from that time until evening. The demand also varies according to the seasons. A heavy load must be carried in fall and winter, but a much lighter load supplies the needs of domestic consumers in the summer period. It was shown that the company is required to keep up a pressure that will meet the varying demands, and witnesses stated that when only a small quantity is used the gas is pushed into the pipes and there is a consequent greater loss from leakage. . . ."

A KP&L witness testified that the basic purpose of a pipeline is to supply gas to firm customers—the residential type customers. When the weather gets cold, these customers have a priority on the gas moving through the pipeline. The pipeline was designed to adequately meet their requirements on peak days. A Commission witness testified that in his cost of service study he broke the classes of

customers into four groups, namely, power plant interruptibles, other interruptibles, firm sales to Kansas Gas Supply and Anadarko Production Company, and all other firm customers. Each of these classes of customers was allocated the company's expenses associated with each class of customer. The cost of gas per MCF, excluding income taxes, based on the Commission's staff exhibit, showed the power plant gas to cost 23.16 cents per MCF and the gas sold to the general service firm customers to cost 44.52 cents per MCF.

Another witness testified:

"With reference to the justification of assigning 71% of the demand to firm customers, I understand that in all instances there are alternate fuel supplies available in case of interruption. The transmission and distribution system is there to serve the firm customers, the space-heating customers at that peak period of time, and according to some of the peak-time information, there have been peak periods where 70% to 75% of the deliveries were to firm customers on these peak days, so if they have the plant to serve that customer when he wants it, certainly he should bear more of the cost of the plant and expense of operating the plant."

We find nothing to justify a charge of discrimination and perferential treatment because of the difference in the rates for industrial users having interruptible service and the firm or residential type service.

The appellant further contends:

"The Commission erred in requiring the rate payers to share the burden of KPL's improvident gas purchase contract with Hugoton Production Company. KPL purchased, under this contract, close to half its gas at 20 cents/MCF, and 22 cents/MCF in 1968. Hugoton did not provide KPL with any evidence to demonstrate the need for periodic escalations. . . ."

There is no evidence in the record suggesting that KP&L paid more for the Hugoton Production Company gas than was necessary as a result of arms length negotiations. The record reflects that KP&L did not give up any other sources of gas when it signed the Hugoton Production Company contract and that particular gas was the best available source, at the best price, of any gas available to the company at the time it was purchased. A KP&L witness testified:

". . . [W]hen you are purchasing large amounts of gas for long periods of time you just naturally have to face up to the fact that there are going to be increases in this gas as you buy it. This is a standard pattern with us and it's a standard pattern with anybody that is buying gas, and I am sure it is pretty much true anyplace.

. . . . . . . . . . . . . . . .

"Q. And you still think this is a matter of prudent business judgment?

"A: Right. This was certainly an arm's-length negotiation and it was a hard and tough negotiation. There were a lot of factors in it."

The evidence shows that under the Hugoton Production Company contract, Hugoton Production Company has the sole responsibility for gathering gas in the field and delivering it to the inlet side of KP&L's Compressor Station. They have the obligation under the contract to make available up to forty billion cubic feet per year and they are required to furnish KP&L's daily requirements up to 150 million cubic feet per day.

A careful examination of the record discloses no basis for declaring the Commission's order unreasonable, discriminatory or unlawful. A court cannot disturb an order of the State Corporation Commission for reasons based only on suspicion and conjecture.

The judgment is affirmed.

APPROVED BY THE COURT.