**APARTMENT HOUSE COUNCIL OF METROPOLITAN WASHINGTON, INC., Petitioner,**

v.

**PUBLIC SERVICE COMMISSION of the District of Columbia, Respondent.**

Potomac Electric Power Company et al., Intervenors.

No. 8164.

District of Columbia Court of Appeals.

Argued Sept. 24, 1974.

Decided Jan. 6, 1975.

Michael O. De Mouy, Washington, D.C., with whom Margaret Stone and Edward E. Schwab, Washington, D.C., were on the brief, for intervenors Friendship House

Ass'n, Inc., and Center City Community Corp.

Charles Jay Pilzer, Washington, D.C., with whom Ronald D. Jacobs, Washington, D.C., was on the brief, for petitioner.

Linus H. Deeny, Asst. Corp. Counsel, with whom C. Francis Murphy, Corp. Counsel, Louis P. Robbins, Princ. Asst. Corp. Counsel, and C. Belden White, II, Asst. Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Carl D. Hobelman, New York City, with whom Jack C. McGregor, Gen. Counsel, Edward A. Caine, Asst. Gen. Counsel, Washington, D.C., Cameron F. MacRae and Samuel M. Sugden, New York City, were on the brief, for intervenor Potomac Electric Power Co.

Before REILLY, Chief Judge, and KERN and NEBEKER, Associate Judges.

NEBEKER, Associate Judge:

This appeal [1] arises from a challenge by Apartment House Council of Metropolitan Washington, Inc. (AHC), to an order of the District of Columbia Public Service Commission (Commission) granting rate increases to the Potomac Electric Power Company (PEPCO). AHC is an association of owners of apartment houses located in the District of Columbia and served by PEPCO. The rate increases result in a lower rate of return for PEPCO from "Residential" class customers than from "High Tension" (HT) class customers (primarily the federal government, taking large amounts of electricity at a high voltage and transforming it with its own equipment) and "General Service" (GS) class customers (primarily commercial and industrial, with generally similar independent capacities).[2] AHC, whose members are GS customers, claims that these differentials in rates of return among classes of customers lack substantial evidentiary support and, hence, constitute the imposition of unreasonable, unjust, and discriminatory rates in violation of D.C.Code 1973, § 43–301.[3] We disagree and conclude that the rates and the inherent differentials approved by the Commission are supported on the record by substantial evidence and are not unreasonable, arbitrary, or capricious as proscribed by D.C.Code 1973, § 43–706.[4]

On April 30, 1973 PEPCO filed an application with the Commission to increase its retail rates for the sale of electric energy in the District of Columbia approximately 19% to a level sufficient to obtain an overall rate of return of 8.75% on its jurisdictional rate base. (As used herein, "jurisdictional rate base" refers to PEPCO's capital investment in facilities providing service to customers whose rates are subject to regulation by the Commission.)

The proposed rate was computed on the twelve months' test period ending June 30,

1. With the imprecision in nomenclature in D.C.Code 1973, § 43–705 (it uses the words "appeal" and "petition of appeal"), we refer to this matter as an "appeal" despite the fact that the parties have referred to themselves as "petitioner" and "respondent."

2. PEPCO has other classes of customers, but the three involved herein are its major classes.

3. D.C.Code 1974, § 43–301 provides:
   Every public utility doing business within the District of Columbia is required to furnish service and facilities reasonably safe and adequate and in all respects just and reasonable. The charge made by any such public utility for any facility or services furnished, or rendered, or to be furnished or rendered, shall be reasonable, just, and nondiscriminatory. Every unjust or unreasonable or discriminatory charge for such facility or service is prohibited and is hereby declared unlawful. . . .

4. D.C.Code 1973, § 43–706. *Appeal limited to questions of law.*
   In the determination of any appeal from an order or decision of the Commission the review by the court shall be limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious.

1973.[5] After extensive testimony, exhibits, and briefs presented by PEPCO, the Commission staff, and many intervenors, including petitioner AHC,[6] the Commission concluded that a fair overall rate of return would be within the range of 8.3% to 8.5%.[7] Since PEPCO was experiencing a revenue deficiency at that time while operating under an authorized 7.25% rate of return, the Commission directed PEPCO to submit proposed rate schedules designed to produce additional revenue and a rate of return within this 8.3% to 8.5% range. The Commission concluded that

> low usage consumers [Residential] have not contributed to the need for the new investment and the new capacity required by Pepco in order to meet its public service obligations. We do not believe, therefore, that low usage customers should be required to bear the burden of significant rate increases. . . . We must and do recognize that [the GS and HT] classes of service account for some two-thirds of Pepco's total service in terms of volume and revenues, and account for all of Pepco's recent load growth in the District of Columbia. Residential usage has actually declined.[8] . . . [W]e . . . require that the greater burden of necessary rate increases be imposed on the classes of customers and quantitites of use that appear largely responsible for capacity expansion and increased unit cost investment by Pepco.[9]

Moreover, regarding production costs, the Commission concluded that "the record in this case is even more persuasive than in the last Pepco case that unit costs will increase in the future."[10]

For these reasons, the Commission thereafter approved the rate schedules submitted by PEPCO. Those rate schedules resulted in the following rates of return from the aforementioned customer classes: 7.78% from GS; 8.27% from HT; and 5.63% from Residential. The GS class was to absorb 63.9% of the new increase and thus increase its rates 15.1%. The HT class was to absorb 22.2% of the increase and thus increase its rates 16%, while the Residential class was to absorb 9.2% of the increase and thus increase its rates 10.4%.

AHC applied for reconsideration of the order, which was denied.[11] This review is sought pursuant to D.C.Code 1973, § 43–705, which confers responsibility on this court for appeals from Commission orders.

AHC does not contest the broad discretionary power of the Commission to determine just rates, the Commission's finding that PEPCO is entitled to an 8.5% overall rate of return, the mere fact of a variation in the rates of return among classes of customers, or the failure of the Commission to make findings as to the rates of return on capital investment for the specific classes of customers. It argues that the rate of return differentials lack substantial evidentiary support, particularly as to

5. At the April 30 date of filing, the test period reflected eight months' actual data and four months' forecast. On July 23, PEPCO filed its updated actual figures for the remaining months in the test period.

6. Other intervenors included the United States (by the General Services Administration), Washington Gas Light Co., Washington Metropolitan Area Transit Authority, Safeway Stores, Inc., Friendship House Association, Inc., Consumers Union of the United States, and The Center City Community Corp.

7. Formal Case No. 596, Order No. 5614, at 14, Nov. 16, 1973.

8. *Id.* at 18. The Commission later clarified the statement that "Residential usage has

actually declined" by noting that the "Residential" decline, although not absolute, was relative (*i. e.*, as compared to the GS and HT classes). The Commission then added:
> This comparison of relative use indeed demonstrates more clearly than the trend of absolute numbers the cost-causation factor which was an underlying rationale of our determination that low usage residential customers should not be required to bear the burden of increased rates.

Formal Case No. 596, Order No. 5620, at 3, Dec. 28, 1973.

9. Order No. 5614, *supra* note 7, at 21.

10. *Id.* at 19.

11. Order No. 5620, *supra* note 8.

quantification of costs for each customer class.

■■■■ Our scope of review on appeal of Commission orders is confined to questions of law. Findings of fact are conclusive unless they are "unreasonable, arbitrary, or capricious."[12] Goodman v. Public Service Commission, D.C.App., 309 A.2d 97, 100 (1973); Goodman v. Public Service Commission of District of Columbia, 497 F.2d 661 (D.C. Cir. 1974); Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 115, 118–119, 188 F.2d 11, 14–15 (1950), cert. denied, 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686 (1951). We must examine the entire record to decide whether the findings are supported by substantial evidence and whether " 'the agency . . . could fairly and reasonably find the facts as it did.' . . . A conclusion may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view. . . ." Western Air Lines, Inc. v. Civil Aeronautics Board, 495 F.2d 145, 152 (D. C. Cir. 1974). *See also* Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S. Ct. 1344, 20 L.Ed.2d 312 (1968); Watergate Improvement Associates v. Public Service Commission, D.C.App., 326 A.2d 778 (1974). Moreover, the onus is on AHC to make "a convincing showing that [the rate order] is invalid because it is unjust and unreasonable in its consequences." Watergate Improvement Associates v. Public Service Commission, *supra* 326 A.2d at 784. *See also* D.C.Code 1973, § 43–703.

In determining whether there is substantial evidentiary support in the record for the Commission's decision to approve the rates and the inherent rate of return differentials, we first examine the cost-related factors and then the non-cost-related factors. Regarding cost considerations, PEPCO began the hearings by presenting a detailed study of its increased overall operating costs and the needs for expansion which necessitated the proposed rate increases. This study chronicled future construction plans and escalating construction, labor, fuel, and plant-related costs, as well as investment needs.

Frank S. Walters, PEPCO's principal witness and vice-president in charge of Rate and Regulatory Practices, testified regarding the two primary bases for the rate of return differentials between the GS and Residential classes: (1) the high usage and proportionately greater production costs relating to the GS class; and (2) the GS class' major contribution to summer peak demand due to air conditioners.

As to the first basis, the record reveals that GS sales increased at a rate substantially greater than that of Residential sales from 1971 to 1972. Residential use accounted for a mere 15% of the total use, while GS customers accounted for nearly 56% of the total use. GS users also imposed greater costs per kilowatt-hour for PEPCO than did Residential users. Walters testified:

> [T]he production cost, particularly the cost of plant, is a very large proportion of the total cost of serving a high voltage customer [GS]. . . . [P]roduction cost[s] . . . going to the other end of the scale [Residential] . . . may be a relatively small fraction . . . of the total price paid per kilowatt-hour.

On these bases, PEPCO reflected the increased plant costs of production in an increased rate of return from the high usage customer classes (GS and HT) whose cost of service consisted primarily of production costs as distinguished from voltage reduction, service supply, and meter costs to the Residential class.

Regarding the second basis, the record reveals that PEPCO's rate of return differentials were attributable to the substantial differences between GS summer and winter rates, which were in turn necessitated by the peak demands of GS customers' air conditioners in the summer. Walters stated that

> all of these high voltage customers [GS], practically, are 100 percent air-

12. D.C.Code 1973, § 43–706, *supra* note 4.

conditioned. Not that we think there is anything wrong with air-conditioning, but it is a fact of life that it is a causative factor of our tremendous summer peak.[13] . . . [W]e are concerned with the uniformity that these highly saturated air-conditioning customers present; they all peak at essentially the same time. . . . Now, the small users [Residential] are not quite as saturated with air-conditioning, obviously, as the building that is built with and air-conditioned from the beginning.

Consequently, Walters and the Commission's expert witness both testified that it was reasonable to charge classes using more power during peak times (GS) a higher rate than those using power during off-peak times in order to compensate for off-peak time during which the equipment installed for peak periods stands idle. PEPCO sought to have the customer class which contributed most to current expansion for peak demands bear the major portion of the cost of that expansion.

In an attempt to show that the Residential class contributed more heavily to the summer peak demand than the GS class, AHC introduced into evidence a graph indicating that, at peak demand time, the Residential class showed an increase of 80% over its low point of usage, while GS and HT classes showed increases of only 51% and 60%, respectively. However, this same graph demonstrated also that the Residential class' actual increase in megawatt-hours was negligible when compared to the actual increase in measured units used by the two other classes. It is this actual increase, not the percentage of increase, which determines the class most responsible for PEPCO's summer peak load. In any event, such a percentage increase in peak demand by Residential users did not necessitate a concomitant increase in new equipment investment.

■ Finally as to cost factors, AHC's reliance on PEPCO's failure to present specific cost data for each customer class is misplaced. It is not necessary that differences in rate of return be specifically and quantitatively supported by customer class-cost considerations. The Supreme Court has stated that "[a]llocation of costs is not a matter for the slide-rule. It involves judgment on a myriad of facts. It has no claim to an exact science." Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 589, 65 S.Ct. 829, 833, 89 L.Ed. 1206 (1945). Moreover, equal return from customer classes is not required. Differences can be based not only on quantity, but also on the nature, time, and pattern of use so as to achieve reasonable efficiency and economic operation. A rule of thumb is that a rate structure must achieve the lowest price for the largest possible number of users. Philadelphia Suburban Transportation Co. v. Pennsylvania Public Utility Commission, 3 Pa. Cmwlth. 184, 281 A.2d 179, 186–187 (1971).

■ Walters testified for PEPCO about the difficulty of achieving mathematically precise calculations of costs and rates of return, saying:

> We do not think a uniform rate of return by classes of business is called for. It would be the simple solution, I suppose, because it has a nice arithmetic simplicity, to say every class of business must earn the same. But I could not think it is in keeping with what has been accepted practice in most areas. . . . [Although the rates] were not made without consideration of cost . . . they are not penny-by-penny and block-by-block a cost development. I don't think it could be done.

The Commission concurred in this theory by stating that costs are not the sole criterion for rate-making.[14]

Turning to the non-cost-related factors which justify the rate of return differentials, we note that the Commission in its order acknowledged its obligation to aid in the energy crisis and accordingly recom-

---

13. PEPCO's summer peak in 60% greater than its winter peak.

14. Order No. 5620, *supra* note 8, at 4.

**58**

mended that the revenue burden be shifted from "essential users" (Residential) to "high usage" (GS) classes.[15] The Commission's order also emphasized the value of preserving historic usage patterns and cautioned that elimination of the rate of return differentials in the District of Columbia would require an increase in Residential revenues of $15.9 million, a reduction in GS revenues of $2.4 million, and an increase in HT revenues of $4.5 million, ". . . a patently unjust and unreasonable result."[16]

The aforementioned factors provided substantial evidentiary support for the Commission's determination that the Residential class should not bear the burden of significant rate increases and that the rate increases and the inherent rate of return differentials between classes of customers are just, reasonable, and non-discriminatory. Accordingly the appeal is dismissed and the order of the Commission is affirmed.

So ordered.

---

15. Order No. 5614, *supra* note 7, at 18.

16. Order No. 5620, *supra* note 8, at 4.