(623 P.2d 924)

No. 52,260

MIDWEST GAS USERS ASSOCIATION and ARMCO, INC., *Applicants*, v. STATE CORPORATION COMMISSION, *et al.*, *Respondents*.

Petition for review denied March 25, 1981.

Opinion filed January 23, 1981.

*Stuart W. Conrad, W. H. Bates,* and *Alfred R. Hupp* of Lathrop, Koontz, Righter, Clagett, Parker & Norquist, of Kansas City, Missouri, and *Thomas L. Theis* of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, for the applicants.

*Terence L. Mundorf,* assistant general counsel, and *Brian J. Moline,* general counsel, for the respondent State Corporation Commission.

*Milo M. Unruh,* of Wichita, for the *amicus curiae,* Vulcan Materials Company, Chemicals Division.

Before SPENCER, P.J., ABBOTT and MEYER, JJ.

SPENCER, J.: In this matter we are concerned only with the rate structure (design) by which The Gas Service Company (hereinafter "Gas Service") may realize increased revenue of $3,153,729,

as authorized by order of the Kansas Corporation Commission entered under date of March 5, 1980.

On June 20, 1979, Gas Service filed its application with the Commission for permission to increase retail rates to Kansas customers by an amount sufficient to realize additional annual revenue of $12,749,314. Midwest Gas Users Association and Armco, Inc., (hereinafter collectively "Midwest") were granted leave to intervene. After rehearing before the Commission was denied, Gas Service and Midwest applied for judicial review pursuant to K.S.A. 66-118a. Gas Service subsequently dismissed its application and the parties now before this court are Midwest and the Commission. Vulcan Materials Company, Chemicals Division, has filed its brief *amicus curiae.*

Gas Service has four service classifications: general (primarily residential), small commercial/industrial, large commercial, and large industrial. Residential and small commercial/industrial users are considered "firm" customers in that gas service to those users is to be provided to the extent possible regardless of demand. Large commercial and large industrial users are considered "interruptible" customers in that service to those users may be curtailed at times when total demand on the system exceeds supply. Because of this and certain historical factors, interruptible customers have traditionally paid lower rates per unit of gas consumed than firm customers.

Of the amount requested by Gas Service, the Commission authorized the annual increase in revenue of $3,153,729 to be charged entirely to the large commercial and large industrial classifications. The net effect is: (1) firm customers pay none of the authorized rate increase, and (2) the difference in rates, which still favors the interruptible customers, has been lessened by $.0893 per mcf, the amount found by the Commission to be sufficient to realize the authorized increase in revenue. The propriety of this rate structure is the sole issue on appeal.

I

Evidence before the Commission demonstrated that the rate increase sought by Gas Service was due to increased general operating expenses. The increased cost of gas to Gas Service was not involved in the rate increase because such is automatically passed through to consumers by means of the "purchased gas adjustment" (PGA).

Evidence regarding rate structure is to be found mainly in the

testimony of three witnesses. W. R. Chaney testified for Gas
Service. He recommended a uniform increase to each class of
customers per mcf of gas consumed. He stated that, in establish-
ing a rate structure, consideration must be given to the recognized
decline in gas reserves. Historically, he explained, gas distribu-
tion systems were established to serve residential customers.
Service to interruptible customers was made possible by periods
of surplus inherent within the system, and the addition of inter-
ruptible customers to the system was initially of benefit to the
residential customer. The interruptibles must necessarily have
available an alternative source of fuel. The first priority of a gas
utility must be to the firm customers. Continuation of service to
the interruptibles in a period of declining reserves can be jus-
tified, in his opinion, only "if the price received from such sale is
appropriate."

Dennis Kies testified for Midwest. He presented a cost analysis
of Gas Service based upon a three-day peak period from De-
cember 31, 1978, to January 2, 1979, and concluded that the
interruptibles were already subsidizing the firm customers. His
recommendation was a uniform percentage increase in rates to
the different classes of customers, thus maintaining the existing
proportionate differentials between them.

Fred Adam, utilities division director for the Commission,
testified regarding the Commission staff's proposed rate design.
He was in agreement with Chaney on the need to recognize the
diminution of gas reserves. He added that specific recognition
must be given to the effect of present consumption on future
costs. In his opinion, the firm customers were subsidizing the
interruptibles. Since new gas supplies benefit primarily the low
priority interruptibles by making it possible for them to continue
to receive service, they are subsidized by the residential and small
commercial consumers, the higher priority customers, to the
extent that the interruptibles pay less than the full cost of the new
"replacement" gas. Adam also testified regarding the Natural Gas
Policy Act, 15 U.S.C. § 3301 et seq. (Supplement III, 1979). He
explained that under the Act the price of natural gas is to be
gradually deregulated with a phased-in program of price escala-
tions. The Act also provides for the adoption, by the Federal
Energy Regulatory Commission, of incremental pricing regula-
tions whereby natural gas will be priced at the level of alternative

fuels first to certain large industrial boiler fuel facilities, and later, subject to Congressional review, to other industrial users. Adam recommended placing the entire authorized increase on the interruptibles.

The Commission, after summarizing the evidence and rejecting Kies' cost-of-service study, found:

"Both Mr. Chaney and Mr. Adam recognized in their testimony that the rate design adopted by this Commission must recognize the economic impact of the diminution of gas reserves on the utility and its customers. Both witnesses stated that rates established for industrial and commercial sales should recognize the economic impact to the higher priority domestic and commercial customers from continuing to provide service to lower priority users (large industrial and large commercial). This utility's first priority is to serve its firm (residential) customers and the cost of providing additional gas to meet needs of industrial and large commercial customers must be recognized. . . .

"While rates in the past have been 'cost based,' the Natural Gas Policy Act has created a new and unique situation in rate making. The Act has basically three aspects which affect this case. First, the result of deregulation through, at least 1985, results in constant price escalation to natural gas. Secondly, it entails a departure from fully allocated cost based rates. Third, a principal purpose of the NGPA and incremental pricing is to shelter the firm (residential) customer from the impact of deregulation by, in the first instance, increasing industrial and commercial rates. The overall goals of the NGPA are to encourage conservation, protect the firm (residential) customers from the impact of price deregulation, and price gas at the cost of its replacement. The Commission, being mindful of the above, in order to implement a form of incremental pricing consistent with the NGPA and in conformance with the testimony and evidence heard, makes the following specific findings:

. . . .

"D. The rate design adopted by this Commission will be to increase the LC and LI schedules as reflected in Appendix C by approximately 8.93 cents per Mcf. This will result in Applicant receiving sufficient additional revenue to cover the increase authorized by this order. Additionally, Applicant will establish an additional tariff which will follow the federally mandated incremental pricing for nonexempt sales up to the federal price ceiling. The currently existing PGA will be appropriate to flow-through the benefit from this additional tariff. Nonexempt customers will pay, under this tariff, the difference between the rates authorized herein and the ceiling price for alternate fuel.

"The Commission believes that this plan will allow Applicant appropriate revenue and the rates resulting therefrom will still be lower than the replacement cost of gas, and will accomplish the purposes of federally mandated incremental pricing."

## II

The applicable standard of review was set out in *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 3 Kan. App. 2d 376, 380-381, 595 P.2d 735, *rev. denied* 226 Kan. 792 (1979) (hereinafter *Midwest I*):

"K.S.A. 1978 Supp. 66-118d limits judicial review of an order by the commission to determining whether the order is 'lawful' or 'reasonable.' *Kansas Gas & Electric Co. v. State Corporation Commission*, 218 Kan. 670, Syl. ¶ 1, 544 P.2d 1396 (1976). A court has no power to set aside such an order unless it finds that the commission acted unlawfully or unreasonably. *Jones v. Kansas Gas and Electric Co.*, 222 Kan. 390, 396-7, 565 P.2d 597 (1977). An order is 'lawful' if it is within the statutory authority of the commission, and if the prescribed statutory and procedural rules are followed in making the order. *Central Kansas Power Co. v. State Corporation Commission*, 221 Kan. 505, Syl. ¶ 1, 561 P.2d 779 (1977). An order is generally considered 'reasonable' if it is based on substantial competent evidence. *Jones v. Kansas Gas and Electric Co.*, 222 Kan. 390, Syl. ¶ 2.

"The legislature has vested the commission with wide discretion and its findings have a presumption of validity on review. *Central Kansas Power Co. v. State Corporation Commission*, 221 Kan. at 511. Since discretionary authority has been delegated to the commission, not to the courts, the power of review does not give the courts authority to substitute their judgment for that of the commission. *Central Kansas Power Co. v. State Corporation Commission*, 206 Kan. 670, 675, 482 P.2d 1 (1971). The commission's decisions involve the difficult problems of policy, accounting, economics and other special knowledge that go into fixing utility rates. It is aided by a staff of assistants with experience as statisticians, accountants and engineers, while courts have no comparable facilities for making the necessary determinations. *Southwestern Bell Tel. Co. v. State Corporation Commission*, 192 Kan. 39, 48-9, 386 P.2d 515 (1963). Hence a court may not set aside an order of the commission merely on the ground that it would have arrived at a different conclusion had it been the trier of fact. It is only when the commission's determination is so wide of the mark as to be outside the realm of fair debate that the court may nullify it. *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission*, 217 Kan. 604, 617, 538 P.2d 702 (1975); *Graves Truck Line, Inc. v. State Corporation Commission*, 215 Kan. 565, Syl. ¶ 5, 527 P.2d 1065 (1974)."

*Midwest I* affirmed a rate structure which spread an authorized increase in revenue among the customer classes by a uniform amount. The result was a proportionately higher increase for the interruptible customers than for the firm customers.

*Midwest I* established certain principles which are equally applicable here. It was there stated:

"Determining the total revenue requirements of a utility to give it a reasonable return and designing a rate schedule (*i.e.*, pricing the product to particular classes of customers to permit the utility to recover the revenue to which it is entitled) are separate processes which entail different and distinct considerations." Syl. ¶ 1.

The court also noted the continuing debate over cost of service (the amount of money expended by a utility in providing service to each of its customers) and value of service (the capacity and

willingness of different customer groups to bear increased costs, and the intrinsic value of the commodity furnished) as factors in establishing rate structures. An analysis of case law revealed that the idea that rate structures must be based exclusively on cost of service factors had been "universally rejected." 3 Kan. App. 2d at 384-389. It was there also held that the Commission could properly weigh value of service more heavily than cost of service and could properly consider the increasing cost of gas and the apparent impending gas shortage. Syl. ¶ 7. The court found the ordered rate structure to be based on substantial evidence where the Commission accepted one expert's testimony and conclusions, while rejecting those of another. It was there also held that the Commission could properly make "a decision to flatten the rate differential between large and small consumers based on accepted policy considerations engendered by the changing times." 3 Kan. App. 2d at 389.

Midwest and the *amicus curiae* take issue with this court's earlier application of the statutory standard of review. In particular, they take issue with what is perceived by them as excessive deference by this court to the Commission on matters of policy when reviewing rate structures.

Under the constitutional separation of powers, the regulation of public utilities is legislative in nature. The legislature created the Commission and granted it full and exclusive authority and jurisdiction to supervise, control and regulate the public utilities of this state and, when acting in the exercise of its delegated powers, the Commission is not a quasi-judicial body. *Cities Service Gas Co. v. State Corporation Commission,* 201 Kan. 223, 232-233, 440 P.2d 660 (1968).

Under similar statutory delegation, the United States Supreme Court has held that the Federal Power Commission, now the Federal Energy Regulatory Commission, has broad powers:

"to 'balanc[e] . . . the investor and the consumer interests.' . . .

"Such a construction is consistent with the view of administrative rate making uniformly taken by this Court. The Court has said that the 'legislative discretion implied in the rate making power necessarily extends to the entire legislative process, embracing the method used in reaching the legislative determination as well as that determination itself.' . . . It follows that rate-making agencies are not bound to the service of any single regulatory formula; they are permitted, unless their statutory authority otherwise plainly indicates, 'to make the pragmatic adjustments which may be called for by particular circumstances.'" *Permian Basin Area Rate Cases,* 390 U.S. 747, 776-777, 20 L.Ed.2d 312, 88 S.Ct. 1344 (1968).

In *Permian,* the court affirmed FPC orders prescribing maximum rates for sales in interstate commerce of natural gas produced in a given geographical area. In making its orders, the FPC had considered policy factors as well as more quantitative cost and return factors. The court stated:

"We have emphasized that courts are without authority to set aside any rate adopted by the Commission which is within a 'zone of reasonableness.' *FPC v. Natural Gas Pipeline Co., supra,* at 585. The Commission may, within this zone, employ price functionally in order to achieve relevant regulatory purposes; it may, in particular, take fully into account the probable consequences of a given price level for future programs of exploration and production. Nothing in the purposes or history of the Act forbids the Commission to require different prices for different sales, even if the distinctions are unrelated to quality, if these arrangements are 'necessary or appropriate to carry out the provisions of this Act.' § 16, 15 U.S.C. § 717o. We hold that the statutory 'just and reasonable' standard permits the Commission to require differences in price for simultaneous sales of gas of identical quality, if it has permissibly found that such differences will effectively serve the regulatory purposes contemplated by Congress.

"The Commission's responsibilities include the protection of future, as well as present, consumer interests. It has here found, on the basis of substantial evidence, that a two-price rate structure will both provide a useful incentive to exploration and prevent excessive producer profits. In these circumstances, there is no objection under the Natural Gas Act to the price differentials required by the Commission." 390 U.S. at 797-98.

As stated in *Mobil Oil Corp. v. FPC,* 417 U.S. 283, 331, 41 L.Ed.2d 72, 94 S.Ct. 2328 (1974):

"[T]he Commission 'must be free . . . to devise methods of regulation capable of equitably reconciling diverse and conflicting interests.' *Permian,* 390 U.S., at 767. That principle has obvious applicability in this time of acute energy shortage."

As with the FPC, the Kansas Corporation Commission is empowered to require "just and reasonable" rates. K.S.A. 66-107. In carrying out this function, the Commission is "empowered to do all things necessary and convenient for the exercise of such power, authority and jurisdiction" (K.S.A. 66-101), and the statutory provisions granting such power, authority and jurisdiction are to be liberally construed (K.S.A. 66-141). Clearly, the Commission may consider matters of policy in establishing a "just and reasonable" rate structure. Its doing so is a legislative function.

Midwest and Vulcan take umbrage with the decision in *Sekan Electric Coop. Ass'n v. Kansas Corporation Commission,* 4 Kan.

App. 2d 477, 609 P.2d 188 (1980). There the court affirmed a rate structure which flattened the utility's existing declining block rate structure and established a minimum charge augmented by a flat kilowatt hour charge for all electricity used. The Commission did so even though there had been no independent testimony in support of the rate structure as ordered. In affirming, the court stated:

"The rate design adopted here accords with the Commission's apparent policy of 'flattening' schedules of rates to be charged for energy. See *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 3 Kan. App. 2d at 389. This kind of policy decision is legislative in nature, to be exercised by the Commission under legislative mandate. It demands utmost deference from the judicial branch." 4 Kan. App. 2d at 483.

It is argued that *Sekan* must be overruled since it assertedly purports to uphold a rate structure which was not directly supported by independent testimony before the Commission and, thus, was in violation of the standard that to be "reasonable" the order must be based on "substantial evidence." Without intending to detract in any way from the opinion in *Sekan,* we deem it unnecessary to consider that argument for, in any event, the rate structure ordered here was clearly based on evidence before the Commission, including the testimony of at least one expert witness. We do specifically adhere to the statement that the matter of rate design involves a policy decision which is legislative in nature, and the Commission's orders in that regard demand utmost deference from the judicial branch.

### III

It is argued the rate structure is unreasonable as there is no substantial competent evidence that the increased operating expenses, which necessitated the rate increase, were wholly attributable to the interruptible customers. Absent such evidence, Midwest contends, the order is not only unreasonable but also violates the legal principle enunciated in *Jones v. Kansas Gas and Electric Co.,* 222 Kan. 390, Syl. ¶ 10, 565 P.2d 597 (1977), that "one class of consumers shall not be burdened with costs created by another class."

The first part of Midwest's argument is based on the faulty premise that any change in rate structure, such as an increase in the rates charged to a particular class of customers, must be tied to the cause of a utility's request for additional revenue. It may be conceded that the evidence before the Commission established

that the increase in operating expenses which necessitated this particular rate increase was not, in the main, attributable to the interruptible customers. However, as was held in *Midwest I,* a determination of a utility's total revenue requirements, as in response to increases in general operating expenses, and designing a rate structure, are separate processes which entail different and distinct considerations. Syl. ¶ 1. For purposes of determining Gas Service's revenue requirements, leading to the authorized revenue increase of $3,153,729, the increase in general operating expenses was clearly the relevant consideration. For purposes of rate structure, however, such an increase in expenses was not the most relevant factor. The Commission could properly consider for example the "value of service" to the different customer classes, the diminution of gas reserves, and the "cost" in terms of future availability to firm customers of continuing to provide service to interruptibles.

Such determinations as to rate structure could be made anew in this proceeding. The prior rate structure was not res judicata. Midwest reads too much into the statement in *Southwestern Bell Tel. Co. v. Kansas Corporation Commission,* 4 Kan. App. 2d 44, 47, 602 P.2d 131 (1979), *rev. denied* 227 Kan. 927 (1980), that "all rates fixed by the Commission are prima facie reasonable unless or until changed or modified by the Commission or court order. K.S.A. 66-115." Although the rate structure which previously existed was presumptively valid, such does not mean, as Midwest implies, that such was based on "cost of service - no more - no less," to the different customer classes which could be altered only by evidence of a change in cost of service. In fact, the rate structure affirmed in *Midwest I* was not based on cost of service but primarily upon value of service. The presumption of validity which attached to that rate structure was simply that under conditions then existing, it was "just and reasonable." K.S.A. 66-107. The Commission properly considered changed conditions in factors other than cost of service in making its rate structure order in this proceeding.

It was therefore unnecessary that the evidence demonstrate the operating expenses which necessitated the rate increase were attributable to the interruptible customers. The Commission heard testimony from three primary witnesses on rate structure. It accepted the conclusions and the alternative recommendation of

Adam. It accepted many of the conclusions but not the recommendation of Chaney. It rejected both the recommendation and conclusions of Kies. Clearly, the order of the Commission was based on substantial evidence.

In *Midwest I* it was stated:

"We think Midwest reads too much into an unexceptionable but abstract statement of law. In *Jones* the court dealt with two commodities, credit and collection expense, which were quite distinct from the utilities' basic service, which was the sale of electricity. As to those collateral commodities costs were readily available from the companies' books, and were relatively easy to allocate to the classes of customers who created them. That is quite a different situation from attempts to allocate system-wide costs of operating an entire utility. As illustrated by the cases discussed above, the latter task is universally regarded as impossible to perform with any degree of reliability. We cannot believe the law requires, or that the KCC must require, studies which are expensive to make and unreliable when made.

"For rate design purposes cost studies may be required by the KCC, or may be offered by a party as was done here. See *Secretary of the Army v. State Corporation Commission,* 206 Kan. 139, 476 P.2d 629 (1970). However, the weight to be given the resulting data when offered is peculiarly within the domain of the KCC. If the KCC is convinced or the evidence indisputably demonstrates that a rate structure in fact imposes on one class costs created by another, the rate structure cannot withstand the test of *Jones.* We do not, however, read *Jones* as requiring a cost of service analysis in every rate design case. A rate design fair on its face, with substantial evidence to support it, may be approved without a cost of service study absent a convincing showing of a *Jones* violation." 3 Kan. App. 2d at 391.

Here it is argued that placing all of the authorized rate increase on one class of consumer, despite the fact that class is not wholly responsible for the utility's increased expenses which necessitated the rate increase, "indisputably demonstrates" a *Jones* violation.

Were we to accept the underlying premise of this argument— that a change in rate structure must be tied to the cause of a utility's increased revenue requirements—Midwest's argument would seem to be compelling. However, we do not accept the premise. In the context of rate structure, consideration of "costs created" by one or another class of consumers cannot be limited to assigning responsibility for increases in a utility's expenses necessitating a particular rate increase. Such approach ignores historical "costs" of creating the utility's system. The evidence does not establish that such "costs" were already fully recognized in the existing rate structure and there is no presumption to that effect. Moreover, as was stated in *Midwest I,* cost-of-service

studies designed to measure and assign such historical "costs" are "unrealistic, both in attainment and in terms of operation . . . ." Syl. ¶ 2. As Chaney testified in this proceeding, even though one class of consumer, such as the residentials, might initially have been responsible for creating the "cost" of the utility's distribution system, the interruptibles also make use of that system at no additional "cost" other than connecting to it. Are the interruptibles to be assigned a portion of the initial cost or only those of connecting to it? Because of these and other difficulties, *Midwest I* found that cost of service had been universally rejected as the determinative factor of rate structure. Other matters also must be considered when assigning "costs" to a customer class for purposes of rate structure. As the evidence here indicates, there are "costs" in terms of future availability of natural gas to be provided the firm customers, who are of the first priority, while continuing to provide any service whatsoever to the interruptibles in a market of diminishing gas reserves. There is also the high cost of replacement gas which the evidence indicates is made necessary mainly because of the interruptibles, but which nevertheless is spread to all classes of customers.

In the context of rate structure, the *Jones* principle is simply an aspect of the rule that rates must not be discriminatory. See K.S.A. 66-107. As with other contentions of legislative discrimination, a rate structure imposing differing rates on different classes will be upheld if there is a reasonable basis to support it. *Cf. State ex rel. Schneider v. Liggett,* 223 Kan. 610, 616, 576 P.2d 221 (1978). Other courts have concluded that a rate structure, based upon reasonable considerations similar to those developed before the Commission in this case, may validly impose all of an authorized increase on the large industrial customer class. See *e.g., U.S. Steel Corp. v. Pa. P.U.C.,* 37 Pa. Commw. Ct. 195, 390 A.2d 849 (1978); *CF Industries v. Tenn. Pub. Serv. Comm.,* 599 S.W.2d 536 (Tenn. 1980).

## IV

Finally, Midwest and Vulcan argue that the Commission erred in concluding that the Natural Gas Policy Act of 1978, 15 U.S.C. § 3301 *et seq.,* "required" the rate structure ordered in this proceeding.

Highly summarized, the NGPA provides for gradual elimination of price controls on certain categories of natural gas (§ 3331).

The resulting increase in price of such gas is passed through, in the first instance, to industrial facilities which use natural gas as a boiler fuel (§§ 3341, 3343). The passthrough is by means of a surcharge, commonly called "incremental pricing," to such industrial boiler fuel facilities up to the price of an appropriate alternative fuel as determined by the Federal Energy Regulatory Commission (§ 3344). Within eighteen months of the Act's enactment, the FERC was to establish rules, subject to Congressional review, for extending incremental pricing to general industrial users (§ 3342). After the Commission's order in this case, such rules were promulgated. Congress, however, disapproved the proposed rules. H.R. 655, 96th Cong., 2d Sess., 126 Cong. Rec. 3839 (1980). The FERC subsequently may resubmit rules for extending incremental pricing (§ 3342).

We do not read the Commission's order as indicating the NGPA "required" the rate structure in question. In effect, the order had two parts. The first imposed all of the authorized increase in revenues on the large industrial and commercial customers. The second was an "additional tariff" which, in the terms of the Commission:

"will follow the federally mandated incremental pricing for nonexempt sales up to the federal price ceiling. The currently existing PGA will be appropriate to flow-through the benefit from this additional tariff. Nonexempt customers will pay, under this tariff, the difference between the rates authorized herein and the ceiling price for alternate fuel."

All are agreed that this "additional tariff" is limited to industrial boiler fuel facilities and will provide none of Gas Service's authorized additional revenue. Under FERC rules relating to incremental pricing to industrial boiler fuel facilities, the surcharge is passed back to the interstate pipeline supplier, which is to reduce the purchased gas adjustment it passes on to all customers by a corresponding amount. The "additional tariff" ordered by the Commission here simply shortens this process by having Gas Service, rather than its interstate pipeline supplier, retain the surcharge collected from Kansas industrial boiler fuel facilities and, in turn, reduce the PGA to Kansas customers. Thus, all of the surcharge collected in Kansas is retained in this state. Neither Midwest nor Vulcan challenges this part of the order.

The Commission's reference in its order to "implement[ing] a form of incremental pricing consistent with the NGPA" clearly

means the "additional tariff" which is not challenged. Beyond this, the Commission merely refers to the policy behind the NGPA as additional support for the challenged portion of the order placing all the authorized increase on the large industrial and commercial users. The fact that Congress, subsequent to the Commission's order here, disapproved extension of incremental pricing to general industrial users has no effect. The order does not price gas to the large industrial and commercial users at the level of replacement fuel, which would have been the result (as to industrial users) under the disapproved extension. Rather, the price to such users is increased only slightly to a level which is still below the price to the firm customers or the price of replacement gas.

Affirmed.