(37 P.3d 640)
No. 87,485

FARMLAND INDUSTRIES, INC., and VULCAN MATERIALS COMPANY, *Appellants*, v. KANSAS CORPORATION COMMISSION, *Appellee*.

No. 87,500

UNIVERSITY OF KANSAS MEDICAL CENTER, CARGILL, INC., GENERAL MOTORS CORPORATION, OWENS-CORNING FIBERGLAS, and PROCTER & GAMBLE MANFACTURING, INC., (The Kansas Industrial Consumers), *Appellants*, v. KANSAS CORPORATION COMMISSION, *Appellee*.

Opinion filed November 21, 2001.

## No. 87,485

*James P. Zakoura* and *David J. Roberts*, of Smithyman & Zakoura, Chartered, of Overland Park, for appellants Farmland and Vulcan Materials Company.

*John McNish*, advisory counsel, *Paula Lentz*, assistant general counsel, and *Susan B. Cunningham*, general counsel, of the Kansas Corporation Commission, for appellee.

*C. Edward Peterson* and *Stuart W. Conrad*, of Finnegan, Conrad & Peterson, L.C., of Kansas City, Missouri, for intervenor Midwest Gas Users' Association.

*Niki Christopher* and *Walker A. Hendrix*, of Topeka, for intervenor Citizens' Utility Ratepayer Board.

*James G. Flaherty* and *Daniel D. Covington*, of Anderson, Byrd, Richeson, Flaherty & Henrichs, L.L.P., of Ottawa, for intervenors UtiliCorp United, Inc.,

d/b/a Peoples Natural Gas Company and Kansas Public Service Company, and Greeley Gas Company, a division of Atmos Energy Corporation.

*John P. DeCoursey* and *Larry M. Cowger,* of Overland Park, for intervenor Kansas Gas Service Company, a division of ONEOK, Inc.

*Robert B. Van Cleave,* of Gates & Clyde, Chartered, of Overland Park, and *Robert C. Johnson* and *Lisa C. Langeneckert,* of St. Louis, Missouri, for intervenor Kansas Energy Group.

## No. 87,500

*Frank W. Lipsman,* of Bryan Cave, LLP, of Overland Park, and *Diana M. Vuylsteke,* of Bryan Cave, LLP, of St. Louis, Missouri, for appellants.

*John McNish,* advisory counsel, *Paula Lentz,* assistant general counsel, and *Susan B. Cunningham,* general counsel, of the Kansas Corporation Commission, for appellee.

*Robert B. Van Cleave,* of Gates & Clyde, Chartered, of Overland Park, and *Robert C. Johnson* and *Lisa C. Langeneckert,* of St. Louis, Missouri, for intervenor Kansas Energy Group.

*C. Edward Peterson* and *Stuart W. Conrad,* of Finnegan, Conrad & Peterson, L.C., of Kansas City, Missouri, for intervenor Midwest Gas Users' Association.

*James G. Flaherty* and *Daniel D. Covington,* of Anderson, Byrd, Richeson, Flaherty & Henrichs, L.L.P., of Ottawa, for intervenors UtiliCorp United Inc., d/b/a Peoples Natural Gas Company and Kansas Public Service Company, and Greeley Gas Company, a division of Atmos Energy Corporation.

*Niki Christopher* and *Walker A. Hendrix,* of Topeka, for intervenor Citizens' Utility Ratepayer Board.

*Larry M. Cowger* and *John P. DeCoursey,* of Overland Park, for intervenor Kansas Gas Service Company, a Division of ONEOK, Inc.

Before ELLIOTT, P.J., MARQUARDT and BEIER, JJ.

ELLIOTT, J.: Farmland Industries, Inc. (Farmland), Vulcan Materials Company (Vulcan), and Kansas Industrial Consumers (KIC) (collectively petitioners) filed separate appeals challenging several orders issued by the Kansas Corporation Commission (KCC) allocating refunds that local distribution companies (LDCs) received from upstream participants in the natural gas industry to qualified low-income residential consumers.

We heard arguments on the two cases on the same day, and we are filing one opinion to dispose of both appeals. We affirm.

The Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. § 3301 *et seq.* (1994), allowed producers to charge an amount in excess of the statutory maximum price in order to recover the cost of State severance taxes. 15 U.S.C. § 3320(a)(1) (repealed effective 7/26/89). Prior to the NGPA, the federal regulatory agency had permitted producers to include in their prices the cost of Kansas ad valorem taxes. See Federal Power Commission Opinion No. 699-D, 52 F.P.C. 915 (1974).

Commencing in 1983, numerous parties filed pleadings with the Federal Energy Regulatory Commission (FERC) challenging producers' actions in using the cost of Kansas ad valorem taxes to exceed the maximum NGPA price. Initially, FERC ruled the practice to be lawful under the NGPA. *Sun Exploration & Production Co.*, 36 FERC ¶ 61,093 (1986); see *Northern Natural Gas Co.*, 38 FERC ¶ 61,062 (1987). Thus began the long and tortured history of this litigation.

After considerable delay, FERC changed its position and ruled the Kansas ad valorem tax was not a "severance tax" under NGPA; FERC ordered the producers to refund the excess charges and also ordered the pipelines to flow through the refunds to their customers, the LDCs. *Colorado Interstate Gas Co.*, 65 FERC ¶ 61,292, at 62,374 (1993). Three years later, the D.C. Circuit Court affirmed FERC's ruling that Kansas ad valorem taxes were not "severance" taxes under federal law. *Public Service Co. of Colorado v. F.E.R.C.*, 91 F.3d 1478, 1484-86 (D.C. Cir. 1996), *cert. denied* 520 U.S. 1224 (1997).

Between 1983 and 1988, tariffs filed by LDCs in Kansas all contained purchased gas adjustment clauses (PGA) or cost of gas riders (COGR) permitting the LDCs to pass on their natural gas commodity cost (selling price from pipeline to LDC) to their customers. Based on the clauses, Kansas ad valorem taxes were passed on to retail customers.

After 1988, the KCC permitted commercial and industrial customers in Kansas to purchase natural gas directly from producers and marketers and pay only transportation costs to pipelines and LDCs for delivery of the gas. As a result, these LDCs' current

"sales" customers are a small number of commercial customers and residential users.

Under the tariffs on file with the KCC in 1988, LDCs were not permitted to keep the refunds they were receiving from pipelines. The tariffs required any refunds received to be passed on through PGA or COGR provisions. The tariffs also contained general language allowing the KCC to make case-by-case determinations for the distribution of supplier refunds.

In May 1998, the KCC opened a generic investigation to establish general policies for the handling of tax refunds the Kansas LDCs were receiving from the pipelines, concluding it had jurisdiction to require LDCs to pass the refunds on to customers, to the extent the customers were not under FERC jurisdiction. Separate dockets were opened for each LDC.

Between 1984 and 1988, Vulcan was a retail customer of Peoples Natural Gas Company (PNG), a division of UtiliCorp. After 1988, Vulcan ceased buying gas from PNG and commenced purchasing and transporting gas directly from a pipeline.

During the 1983 to 1988 time frame, Farmland purchased gas for its various facilities in Kansas from United Cities Gas Company (now Greeley Gas Company [Greeley]), PNG, and Kansas Gas Service Company, a division of ONEOK, Inc. (KGS).

KIC is a group including Cargill, Inc., General Motors Corporation, Owens-Corning Fiberglas Corporation, Procter & Gamble, and the University of Kansas Medical Center, all of whom are former sales customers of KGS.

At one point, the KCC determined that a portion of the overcharge refunds would be distributed to large industrial and commercial consumers who were sales customers of the LDCs between 1983 and 1988. The KCC stated that sales customers who actually paid the excess charges had an "equitable interest" in the refunds and should, therefore, receive refunds to the extent possible. Each of these separate KCC orders, however, stated no refunds would be made until other legal issues were resolved.

Natural gas prices began to rapidly increase in late 2000, and the KCC established a task force to address methods for mitigating expected increasing gas prices during the upcoming winter. KGS

and other LDCs sought to amend their refund distribution plans in light of the increasing gas prices, to allocate a portion of the refund accounts to present sales customers to alleviate the consequences of a harsh winter.

In January 2001, the KCC issued an order permitting KGS to refund $5.6 million to existing sales customers via its COGR, but requiring KGS to retain in escrow the funds allocated to the former large industrial customers.

Later in January 2001, the Kansas Senate and Kansas House passed resolutions urging the KCC to pass on the ad valorem tax refunds to residential consumers "to the extent allowed by law." S. Res. 1808 and H. Con. Res. 6006.

The Citizens' Utility Ratepayer Board (CURB) then sought residential ratepayer relief, requesting immediate distribution of *all* ad valorem tax refunds in accordance with the House and Senate resolutions. The KCC granted reconsideration of its prior order and set a schedule for evidentiary hearings on the overcharge distribution plans. No evidentiary hearings had been held in 1999, but the KCC ruled that changed circumstances—including the prior winter's harsh weather, the significant increase in gas prices, and the increase in refunds received by the LDCs—warranted such hearings. The KCC indicated it would reconsider the plans previously approved in 1999, in light of the changed circumstances. The KCC also consolidated the separate dockets for the various LDCs into a single docket.

The KCC then issued its initial order finding residential customers were the least able to absorb the increases in gas costs which occurred in 2000 to 2001. The KCC also noted that most of the large industrial consumers left the LDC systems as sales customers after 1988, requiring LDC costs to be spread among smaller customers.

Accordingly, the KCC determined the claims of the large industrial consumers failed to justify a continuation of the prior distribution plans and ordered the LDCs to submit new plans for the distribution of refunds to their current low-income customers. The eligible customers were defined as at or below 300% of federal poverty level.

Several motions for reconsideration were filed, and KCC staff moved for a clarification. The KCC issued an order denying all the parties' motions for reconsideration and clarifying its May 3, 2001, order. The KCC acknowledged it had previously recognized petitioners' equitable claims and noted petitioners' decision to become transportation only customers created economic tradeoffs: Petitioners can now buy gas directly from producers at reduced rates, but gave up any automatic right to potential future refunds under the PGAs or COGRs.

Petitioners primarily attack the KCC order allocating refunds by claiming they have a vested property interest in the refunds under federal and/or state law. Petitioners claim the KCC cannot take their property and allocate it to other LDC customers.

A right is "vested" when a party has a clear present interest or right; a mere expectation of a future benefit or a contingent interest founded on anticipated continuance of existing laws is not a vested right. *Board of Greenwood County Comm'rs v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778 (1980); *Stockman v. Unified Gov't of Wyandotte County/Kansas City*, 27 Kan. App. 2d 453, 461, 6 P.3d 900 (2000). For a right to be vested, there must exist an expectation of permanency. *U.S.D. No. 443 v. Kansas State Board of Education*, 266 Kan. 75, 94, 966 P.2d 68 (1998). If a right is vested, it cannot be taken away by retroactive legislation since that would constitute a taking without due process. *Osborn v. Electric Corp. of Kansas City*, 23 Kan. App. 2d 868, 873, 936 P.2d 297, *rev. denied* 262 Kan. 962 (1997).

*Rights under federal law*

Petitioners claim a vested right under federal law because the upstream charges were unlawful under the NGPA and those charges were paid by themselves as end users. They also rely on various FERC and federal court rulings, claiming those rulings require the refunds to be directed to them.

Petitioners' arguments are certainly not without appeal, but are unsound. The FERC and federal court rulings on which they rely specifically dealt only with the relationships between producers and pipelines—controlled by the NGPA—and between pipelines

and LDCs—which are controlled by the Natural Gas Act (NGA), 15 U.S.C. § 717(b) (1994). Nothing in those opinions extends a clear present right to refunds to *retail sales* customers.

In various cases involved in the history of this litigation, FERC and the courts mentioned that refunds must be returned to the "customer." For example, in *Public Service Co. of Colorado v. F.E.R.C.*, 91 F.3d 1478, the court upheld FERC's ruling that Kansas ad valorem taxes were not severance taxes under the NGPA. 91 F.3d at 1486. The circuit court also noted FERC's order required the producers to make refunds to the pipelines and for the pipelines to "channel those refunds to *their customers.*" 91 F.3d at 1480. (Emphasis added.)

Petitioners also cite to language in *Public Service Co. of Colorado, et al.*, 80 FERC ¶ 61,264 (1997), discussing a procedure to ensure refunds are made to "customers who overpaid the pipelines." 80 FERC ¶ 61,264, at 61,954. The "customers" making the arguments about the refund procedure were LDCs—Public Service Company of Colorado and Cheyenne Light, Fuel and Power Company. 80 FERC ¶ 61,264, at 61,949.

In *Anadarko Petroleum Corp. v. F.E.R.C.*, 196 F.3d 1264 (D.C. Cir. 1999), *cert. denied* 530 U.S. 1213 (2000), the court noted that the equities between the producers and "their customers" did not justify a blanket waiver of interest because of FERC's delays in deciding the issue. 196 F.3d at 1268.

In all these cases, FERC and the courts were discussing the producers, the pipelines, and *their customers*. Here, however, petitioners were not customers of the producers or the pipelines; at relevant times, they were customers only of the LDCs. And petitioners do not dispute that the relationship between the LDCs and *their* customers (including petitioners) was within the exclusive jurisdiction of the KCC. It would be unreasonable to presume the federal decision makers were referring to the ultimate retail customer (who would be outside FERC jurisdiction) absent a clear indication to the contrary.

Further, there is a long history of limiting the effect of federal regulatory agency orders. See *Central States Co. v. Muscatine*, 324 U.S. 138, 143-44, 89 L. Ed. 801, 65 S. Ct. 565 (1945) (while the

purpose of NGA was to protect ultimate consumer, the means available to the Federal Power Commission (FPC) to achieve that purpose was to regulate costs at wholesale and leave to states the function of regulating intrastate distribution or sale of the commodity). This standard was later relaxed, relying on federal courts' equity jurisdiction. See *Power Comm'n v. Interstate Gas Co.*, 336 U.S. 577, 580, 93 L. Ed. 895, 69 S. Ct. 775 (1949).

This earlier federal case law did not mandate the refund of excess charges to the end consumer. At best, it gave federal courts equitable power to do so when a court holds funds paid in as a condition of a stay of a rate appeal. Petitioners cite to no federal statute which otherwise requires FERC to directly allocate refunds to end users.

*Washington Urban League v. F.E.R.C.*, 886 F.2d 1381 (3d Cir. 1989), is also instructive. There, an LDC received a refund from a pipeline. The Urban League, on behalf of retail consumers, petitioned FERC to order those refunds to be passed on to end consumers. FERC rejected the claim. 886 F.2d at 1384. On appeal, the circuit court held that refunds by pipelines were not required to be returned to end consumers and FERC was not required to order LDCs to flow through the refunds. 886 F.2d at 1386, 1388, 1390. The court also rejected arguments that FERC orders requiring refunds to "customers" referred to end-user consumers rather than the pipeline's *direct* customers. 886 F.2d at 1389. In fact, the court held it was reasonable for FERC to handle refunds so as to "leave decisions for the apportionment of such funds to the individual PGAs and tariffs of downstream entities." 886 F.2d at 1390. And finally, the court rejected Urban League's claim that failing to allocate a refund to its members was fundamentally unfair. 886 F.2d at 1390.

Similarly, FERC has recently rejected arguments in a related proceeding that its orders should specifically require LDCs to pass on any Kansas ad valorem tax refunds to their retail customers. *Williams Gas Pipelines Central, Inc.*, 95 FERC ¶ 61,055 (2001). There, Midwest Gas Users' Association (MGUA) objected to a settlement agreement because it did not "give assurance to Kansas

ratepayers that they will ultimately receive their appropriate share of the refunds." 95 FERC ¶ 61,055, at 61,135.

FERC rejected MGUA's objections and specifically refused MGUA's request to order refunds to be paid directly to former retail customers because "the distribution of refunds by an LDC is a matter within the purview of state and local regulatory authorities." 95 FERC ¶ 61,055, at 61,138.

While MGUA has appealed the order to the D.C. Circuit, FERC's order is consistent with the authorities cited above.

Petitioners have no vested right under federal law to the refunds at issue.

### Rights under state law

Petitioners also claim they have a vested right to the refunds under state law, relying on three theories. First, they claim that because federal law mandates return of refunds to end users, the KCC is required to do so under federal preemption rules and K.S.A. 66-1,185. Since we have rejected petitioners' claims that federal law mandates refunds to the end users, this theory fails.

Second, petitioners rely on *Sunflower Pipeline Co. v. Kansas Corporation Commission*, 5 Kan. App. 2d 715, 624 P.2d 466, *rev. denied* 229 Kan. 671 (1981), where we upheld a KCC order requiring a pipeline to provide refunds. Applying the "filed rate doctrine" implied from K.S.A. 66-108 (1980 Ensley) (now K.S.A. 66-101c), we held it was unlawful for the pipeline to charge in excess of the filed rates, even if those filed rates became unreasonably low after the tariff was filed. 5 Kan. App. 2d at 718-19. We also held the KCC had implied authority to order refunds under K.S.A. 66-101. 5 Kan. App. 2d at 719. And finally, we rejected the pipeline's claim that less than full restitution should be ordered on equitable grounds, reasoning that allowing the pipeline to refund less than 100% of the overcharges would constitute retroactive rate making. 5 Kan. App. 2d at 722.

Petitioners' reliance on *Sunflower* is misplaced, as it is factually distinguishable in several important respects. Here, petitioners were required to pay additional charges to their LDCs because the LDCs passed on the ad valorem tax charges passed on to them by

the pipelines and producers. Unlike the utility in *Sunflower*, petitioners here were not initially charged an amount in excess of the filed tariff.

Between 1983 and 1988, the rates paid by petitioners were prima facie valid. In fact, FERC specifically found the charges lawful under the NGPA. *Sun Exploration & Production Co.*, 36 FERC ¶ 61,093 (1986). It was not until 1993 that FERC determined the charges were unlawful and, thus, ordered a refund.

Prior to 1988, the rates petitioners were charged under the LDCs' tariffs were prima facie lawful. In fact, the KCC could not refuse to allow the LDCs to pass on their cost of gas without running into federal preemption problems and perhaps violating K.S.A. 66-1,185. Federal courts have consistently prohibited state utility regulators from issuing rate orders which are inconsistent with FERC-approved rates. See, *e.g.*, *Nantahala Power & Light v. Thornburg*, 476 U.S. 953, 966, 90 L. Ed. 2d 943, 106 S. Ct. 2349 (1986); *Public Service Co. of New Hampshire v. Patch*, 221 F.3d 198, 202-03 (1st Cir. 2000), *cert. denied* 531 U.S. 1145 (2001).

Further, to the extent FERC determined, prior to 1993, that the ad valorem tax charges were proper, the KCC was required to recognize the FERC order and to permit the LDCs to pass those charges on to their customers, including petitioners. K.S.A. 66-1,185. While those charges were determined much later to be unlawful, those charges were lawful at the time they were initially passed through to petitioners.

KIC correctly notes that until judicial review is completed, utilities are subject to refund orders if the rates are ultimately determined to be unlawful. See *Kansas Pipeline Partnership v. Kansas Corporation Comm'n*, 24 Kan. App. 2d 42, Syl. ¶ 9, 941 P.2d 390, *rev. denied* 262 Kan. 961 (1997). However, whether the rates were final does not mean petitioners had a "vested" right to a part of the refunds. Significantly, *Kansas Pipeline Partnership* did not address the mechanisms to utilize when refunding overcharges or involve the prolonged delay as is present in the case at bar.

Finally, in *Sunflower*, we specifically noted our ruling might be different if increased rates were collected under an interim rate made or based on regular orders which were later found to be

unlawful. 5 Kan. App. 2d at 722. In short, *Sunflower* clearly recognized that a utility's obligation to make refunds might differ if the overcharges were collected based on a KCC order allowing the rate increase. That is the situation here. There is no claim the LDCs collected amounts from petitioners that exceeded what, at the time, had been found to be lawful by FERC and the KCC.

*Sunflower* does not create a vested right in petitioners to refunds of charges subsequently determined to be unlawful.

The present case is not unlike *Arco v. Utils. & Transp. Comm'n*, 125 Wash. 2d 805, 888 P.2d 728 (1995). In *Arco*, several former industrial consumers sought review of the commission's order denying them a portion of a refund of overcharges incurred while they were retail customers of an LDC. There, as here, the industrial consumers had chosen to become transportation-only customers.

There, as here, while they were still retail customers, their LDC passed on some increased rates from its pipeline supplier. Later, when the final approved rates were lower, the pipeline paid refunds to the LDC. There, the commission, after the industrial consumers ceased being retail customers, ordered the LDC to pass a portion of the refund on to current retail customers through a prospective rate reduction. The former industrial consumers were not allowed to share the prospective reduction unless they returned to the LDC as retail customers.

There, as here, the former customers appealed, arguing they had a protectable property right to the refunds. And there, the court ruled the former customers had no reasonable expectation they would receive a refund of the rates at the time they paid them to the LDC. The court ruled the former customers were not "overcharged" during the time the interim rates were temporarily allowed. 125 Wash. 2d at 812-13. The court also held there was no clear expectation there would be any refunds since the rates could have been approved in full. 125 Wash. 2d at 812-13.

We adopt the *Arco* reasoning. As in *Arco*, the petitioners in the present case had no reasonable expectation to a refund during the time they were retail customers of the LDCs. Prior to their departure from the system as sales customers, there were no over-

charges under the filed tariffs. At best, they had nothing more than contingent expectations the ad valorem charges passed on to them by the producers, pipelines, and LDCs might be held unlawful in the future. Their interest was contingent upon (1) FERC holding the charges unlawful; (2) FERC ordering pipelines to refund the overcharges to the LDCs; and (3) the KCC ordering LDCs to pass on those refunds to all of their customers, past and present. None of these events occurred prior to petitioners choosing to abandon their positions as retail customers. Petitioners had no vested interest in any future refunds the LDCs might receive.

For their third theory, Farmland and Vulcan argue, in cursory fashion, the KCC orders in late 1999—which allocated a portion of the refunds to them—became final when no one moved for reconsideration of those orders. Accordingly, they claim their rights to refunds vested at that time. But Farmland and Vulcan, in their post-hearing brief to the KCC, specifically stated they were not making a claim based on the 1999 orders.

Farmland and Vulcan are precluded from raising this issue because they failed to include the issue in their motions for reconsideration. See K.S.A. 2000 Supp. 66-118b. The issue was raised by KIC in its motion for reconsideration, but KIC has not briefed it. Since this issue was raised in such a cursory fashion, it is deemed abandoned. See *Campbell v. City of Leavenworth*, 28 Kan. App. 2d 120, 126, 13 P.3d 917 (2000), *rev. denied* 270 Kan. 897 (2001).

Petitioners also argue they have a claim to a share of the refunds under applicable tariffs. Absent a vested right under federal or state statutes or court rulings, the question becomes whether petitioners have any other enforceable rights to the refunds under other law or theories. Other than equitable claims, the only other potential source of a claim to refund would be based on the LDC tariffs.

Here, petitioners' arguments are less than clear. Farmland and Vulcan claim the KCC misconstrued current tariffs and argue the tariffs, by their terms, do not apply to refunds generated in the 1980s. They also seem to imply they may have a claim under current tariffs as transportation customers.

KIC argues the refunds cannot legally pass through current tariffs, primarily based on a retroactive rate making claim. Alterna-

tively, KIC argues the KCC abused its discretion in rejecting its equitable claim and allocating all the refunds to low-income residential customers. KIC, however, seems to concede that under KGS's current tariffs, it has, at best, only an equitable claim to the refunds.

Tariffs contain those terms and conditions which govern the relationship between a utility and its customers. Tariffs duly filed with the regulatory agency are generally binding on both the utility and its customers. *Grinsted Products, Inc. v. Kansas Corporation Comm'n*, 262 Kan. 294, 309, 937 P.2d 1 (1997). Legally established tariffs are construed in the same manner as statutes. 262 Kan. at 310. And the interpretation of a "statute" by an agency charged with responsibility of enforcing the "statute" is entitled to judicial deference. *McTaggart v. Liberty Mut. Ins.*, 267 Kan. 641, 645, 983 P.2d 853 (1999).

PGAs (and COGRs) are permitted under FERC regulations and allow pipelines and sellers for resale to pass through increases to their customers without obtaining regulatory approval. FERC also requires cost decreases to be passed through in the form of reductions. See *East Tennessee, Etc. v. Federal Energy Reg.*, 631 F.2d 794 (D.C. Cir. 1980); see *Consolidated Edison v. F.E.R.C.*, 958 F.2d 429, 435 (D.C. Cir. 1992). The PGA/COGR clauses involved in the present case all seem to pass supplier refunds regardless of source to current sales customers.

The KCC interpreted all the tariffs as requiring refunds, *as received by the LDCs,* to be passed on to current sales customers under the PGA/COGR provisions. While Greeley's and UtiliCorp's refund provisions refer to "such customers," reading the tariff as a whole, this reference does not seem to contemplate the actual retail customers who paid the overcharge, but only the utility's current customers. Nothing in the tariffs indicates the refund mechanisms were tied to when the overcharges were actually paid rather than when the LDC received the refund. Moreover, the fact that "certain" provisions of KGS's COGR "may" apply to transportation service does not negate the supplier refunds provisions' reference to customers, later defined as residential, commercial, and industrial *sales* customers.

Reading the tariffs as a whole, the KCC's interpretation of them is not contrary to the clear language of the "statutes" and is not erroneous *as a matter of law*. Under the doctrine of operative construction, we must defer to the KCC's interpretation of the tariffs.

An inherent problem with PGA/COGR clauses is that they have a built-in delay factor. They permit LDCs to pass along price increases and decreases to current customers. But when the increases or decreases are due to atypical events, they do not provide a mechanism for allocating surcharges or refunds to those who were customers when the unusual event actually occurred. Courts generally permit the surcharges/refunds to be passed on to current customers for pragmatic reasons: It is simply too burdensome to maintain records to track when customers join and leave the system in the event these unusual events occur. Petitioners cite no cases which clearly mandate allocation of refunds to former customers.

When a wholesaler of natural gas receives a refund from upstream producers or pipelines, FERC generally has interpreted PGA/COGR clauses to require those refunds to be passed on to the wholesaler's *current* customers. *E.g., East Tennessee*, 631 F.2d at 802. But see *Panhandle Eastern Pipe Line v. Federal Energy*, 95 F.3d 62, 73-74 (D.C. Cir. 1996), where a pipeline was ordered to reimburse customers, some of whom no longer contracted with the pipeline. However, the former customers in that case were LDCs. Thus, the customer relationship was within FERC's jurisdiction.

In other contexts, courts have recognized that delays in ordering refunds can prevent refunds from reaching those who actually paid the overcharges due to the transient nature of our society. See *F.P.C. v. Tennessee Gas Co.*, 371 U.S. 145, 154-55, n.9, 9 L. Ed. 2d 199, 83 S. Ct. 211 (1962), *cf. Tennessee Valley Mun. Gas Ass'n v. Federal Power Com'n*, 470 F.2d 446, 452-53 (D.C. Cir. 1972).

In a different context, we have held that passing refunds through mechanisms *other than* current cost adjustment clauses in tariffs is retroactive rate making. *Kansas Gas & Electric Co. v. Kansas Corp. Comm'n*, 14 Kan. App. 2d at 527, 532-37, 794 P.2d 1165, *rev. denied* 247 Kan. 704 (1990). Other states have also recognized that their statutes give utility commissions power to issue refunds

to current customers for refunds/surcharges passed on after considerable delay. *E.g.*, *Assembly v. Public Utilities Com.*, 12 Cal. 4th 87, 100-02, 48 Cal. Rptr. 2d 54, 906 P.2d 1209 (1995); *In re Northern Indiana Public Service Co.*, 157 Pub. Util. Rep. 4th (PUR) 206, 229-31 (Ind. 1994); *Archer Daniels Midland v. State*, 485 N.W.2d 465 (Iowa 1992) (take-or-pay surcharge to LDC was current cost rather than a past loss and could be passed on to current customers).

Further, allowing refunds from prior overcharges to pass under current tariffs makes common sense. Requiring utilities to trace overcharges back to the original customers who might have paid all or part of the overcharges is inefficient and difficult. As noted by the Washington Supreme Court in *Arco*:

"This result reflects the commonsense rule that expenses and savings are passed along to customers when they are realized. Businesses do not normally try to determine the point of origination of the expense or saving, and then track down the customers that existed at the time. For example, if a merchant incurs a large liability as a result of a lawsuit that arose from an accident on the premises several years earlier, the merchant would not try to charge extra to those who made purchases the day of the accident. The expense would instead be passed along to the merchant's current customers. . . . It is reasonable for the Commission to approve a plan that accomplishes what would essentially occur in an unregulated business enterprise." 125 Wash. 2d at 815 n.5.

In the present case, no one disputes the LDCs should not be required to track down all the residential customers on their systems between 1983 and 1988 and pay them a pro rata portion of the ad valorem overcharges. Petitioners, however, argue they should receive a portion of the refunds simply because they kept better records or because information regarding their proportionate purchases was generated in the *Wyoming Tightsands* antitrust litigation—which was proceeding during the relevant time frame. The availability of this information, however, does not make petitioners' rights vested and does not otherwise entitle them to refunds under current tariffs.

Petitioners also argue that if the refunds are not returned to the retail customers who actually paid the overcharges, the allocation would constitute unlawful retroactive rate making.

Previously, the Supreme Court held that due process requires that a regulated utility be allowed a reasonable return on the value of its property at the time it is being used for public service. Accordingly, profits a company may have earned in the past cannot be used to sustain confiscatory rates for the future. *Board of Commrs v. N.Y. Tel. Co.*, 271 U.S. 23, 32, 70 L. Ed. 808, 46 S. Ct. 363 (1926).

Petitioners also rely on *Sunflower* to assert retroactive rate making has occurred. While *Sunflower* stated that allowing a utility to avoid a full refund could constitute retroactive rate making, the case is clearly distinguishable, as we have previously discussed. Further, federal preemption rules discussed above establish that the rates paid by petitioners at the time they were paid were lawful.

While the parameters of retroactive rate making are not always clear, the consensus among utility commissions and courts is that refunds like those involved in the present case do not raise retroactive rate-making concerns. Courts have recognized that using PGA/COGR clauses to pass credits on to a wholesaler's *current* customers is not retroactive rate making; it simply enforces tariffs as they exist at the time of the credit. *East Tennessee*, 631 F.2d at 800. A present refund on past payments simply "reflects how the passage of time can alter the appropriate form of the pass through that was mandatory under tariffs already in effect when the payments were made." 631 F.2d at 800. And *cf. Natural Gas Clearinghouse v. F.E.R.C.*, 965 F.2d 1066, 1073 (D. Cir. 1992).

Other states have also noted surcharge and refund proceedings are separate from base-rate proceedings and do not constitute retroactive rate making. *E.g., UGI Utilities v. Pennsylvania Public Util.*, 677 A.2d 882, 887 (Pa. Commw. 1996).

Accordingly, allocating refunds to current customers under current PGA/COGRs rather than to former customers who may have actually paid the overcharges does not violate the ban against retroactive rate making.

Petitioners also contend the allocation of all the refunds to a limited class of ratepayers was unlawful, discriminatory, and unduly preferential.

As a general rule, one class of consumers cannot be burdened with costs created by another class. *Jones v. Kansas Gas and Electric Co.*, 222 Kan. 390, Syl. ¶ 10, 565 P.2d 597 (1977); *Midwest Gas Users Ass'n v. Kansas Corporation Commission*, 5 Kan. App. 2d 653, 660, 623 P.2d 924, *rev. denied* 229 Kan. 670 (1981). On the other hand, we have rejected the notion this principle requires that *rate design* allocation be limited to cost of service factors. *Midwest Gas*, 5 Kan. App. 2d at 661. In reviewing rate design issues, a structure imposing different rates on different classes will be upheld if there is a reasonable basis to support it. 5 Kan. App. 2d at 663.

As noted, the KCC has broad discretion in making decisions in rate design types of issues. Since petitioners (1) had no vested right to refunds, and (2) were not entitled to claim refunds under applicable tariffs, at most they have only an equitable claim as former customers. Accordingly, even though the KCC allocated the refunds to current customers (or even a small subclass of current customers), petitioners cannot show *they* have been burdened with costs created by another class; they would be unable to obtain refunds under the tariffs, even if the KCC had not modified the refund provisions.

Petitioners' reliance on K.S.A. 2000 Supp. 66-1,202 and K.S.A. 2000 Supp. 66-1,204 is misplaced. The parties provide little guidance in defining what is "unreasonably" discriminatory or "unduly" preferential. To the extent the KCC is making allocations based on current versus former customers, the order is not unduly or unreasonably discriminatory or preferential. The cases discussed above demonstrate it is a well-established process to flow through refunds to current customers through PGA/COGR clauses, regardless of the source of the original overcharges. These same arguments, under similar Washington statutes, were rejected in *Arco*. 125 Washington 2d at 816-17.

To the extent petitioners contend the KCC orders are unduly discriminatory or preferential because they favor one subclass of current customers *rather than all* current customers, the question is a close one. The KCC allocated most, if not all, of the refunds to low-income residential customers. The bulk of current custom-

ers otherwise entitled to receive refunds are statutorily represented by CURB. See K.S.A. 66-1223(a). Yet CURB initiated the proceedings resulting in the orders at issue here. At oral argument, CURB counsel informed us that while they received a few phone calls expressing disappointment, no calls protested the position taken by CURB.

Since current residential and small commercial customers are represented by CURB, petitioners are precluded from claiming the KCC order unfairly discriminates against other current sales customers. We must limit our consideration to the equities between petitioners and the current low-income customers.

In their briefs, petitioners have not challenged the KCC's factual findings that (1) by leaving the LDC systems as sales customers in 1988, petitioners caused substantial operational costs to be spread among residential and small commercial customers (although the industrial customers may have carried an unfairly heavy burden of those costs before 1988); (2) petitioners had more mechanisms available between 1983 and 1988 to spread the cost of gas caused by the ad valorem overcharges than did residential consumers; (3) the winter weather in 2000-2001 was unusually harsh; (4) natural gas prices were unusually high during that winter; and (5) many residential consumers were disproportionally harmed by the harsh winter and the unusually high gas prices. Petitioners' claim of undue discrimination fails; the KCC order was not so "wide of the mark" to be reversible. See *Kansas Pipeline Partnership v. Kansas Corporation Comm'n*, 24 Kan. App. 2d 42, 941 P.2d 390, *rev. denied* 262 Kan. 961 (1997).

Petitioners rely on a recent decision from the Missouri Public Service Commission to support this argument. See *In re Missouri Gas Energy's Application for Variance*, No. GE-2001-393 (March 15, 2001) (*MGE*). However, *MGE* dealt with a finding that using refunds to fund social engineering-type programs was unlawful; the dispute arose because *current* customers were subjected to discrimination by the Commission's decision. Petitioners, not otherwise entitled to refunds under current-filed tariffs, cannot find comfort in relying on *MGE*.

Finally, petitioners claim the KCC order denying them a portion of the refund was unreasonable, arbitrary, and capricious; their arguments refer in part to the tariff, discrimination, and retroactive rate-making arguments addressed above. Those arguments have failed.

KIC also argues it is arbitrary and capricious to deny their equitable claim in order to benefit a very limited class of current customers. Frankly, if we were the KCC, we might well have decided this case differently. But we are not permitted to substitute our judgment for that of the KCC. Hence, according to *Kansas Pipeline Partnership*, we

" ' "may not set aside an order of the commission merely on the ground that it would have arrived at a different conclusion had it been the trier of fact. It is only when the commission's determination is so wide of the mark as to be outside the realm of fair debate that the court may nullify it." ' " 24 Kan. App. 2d at 48-49.

Allocating refunds is analogous to a rate design order, which allocates revenue requirements among different classes of customers. We have routinely recognized rate design entails distinct considerations. *E.g., Midwest Gas Users Ass'n v. Kansas Corporation Commission*, 5 Kan. App. 2d 653.

Here, the KCC was faced with evidence requiring it to weigh petitioners' equitable claims to refunds against evidence of the present need of some current retail sales customers. Another body might well have weighed those concerns differently than did the KCC. Other rational minds could reasonably conclude the present solution was nothing more than an expedient resolution of various social welfare issues. But because the KCC is permitted to make pragmatic adjustments when reconciling diverse interests, we are unable to state the KCC was "so wide of the mark" that we can nullify the KCC order. *Kansas Pipeline Partnership*, 24 Kan. App. 2d at 48-49.

We also note a similar argument was considered and rejected in *Arco*:

"The evidence in the record regarding the burdens, the responsibility for which [the former customers] avoided by leaving the [LDC's] system, is enough to constitute substantial evidence upon which the Commission could have decided that it is just and reasonable that they should not share in the benefit of the refund

allocation. Similarly, the distinction between current customers and former customers is enough to support the Commission's order under the arbitrary and capricious standard." 125 Wash. 2d at 812.

Petitioners' argument that the KCC order was arbitrary and capricious fails.

We must, therefore, affirm the KCC order.

The stay order and bonds previously ordered shall remain in force and effect until this opinion becomes final and a mandate is issued.